UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| FIRE-DEX, LLC,<br><br>Plaintiff,<br><br>v.<br><br>ADMIRAL INSURANCE COMPANY,<br><br>Defendant,<br><br>and<br><br>ST. PAUL SURPLUS LINES INSURANCE COMPANY, *et al.*,<br><br>Intervenors-Defendants. | ) | CASE NO.: 1:23-cv-01612<br><br>JUDGE BRIDGET MEEHAN BRENNAN<br><br>**MEMORANDUM OPINION AND ORDER** |

Over the past several years, concerns about the potential health risks that come with exposure to per- and polyfluoroalkyl substances ("PFAS"), known colloquially as forever chemicals, have been on the rise. Numerous plaintiffs have filed suit against companies that manufacture PFAS or PFAS-containing products, alleging that PFAS causes cancer and other serious illnesses. This case concerns insurance-coverage disputes over three such lawsuits, filed against Plaintiff Fire-Dex, LLC, that are now consolidated in multidistrict litigation before the District of South Carolina (the "Underlying Lawsuits").[1] *See In re Aqueous Film-Forming Foams Prods. Liab. Litig.*, No. 2:18-mn-02873 (D.S.C.).

[1] The Underlying Lawsuits are *Marchetti v. 3M Co.*, No. 2:22-cv-00710 (D.S.C.); *Gibson v. 3M Co.*, No. 2:22-cv-01303 (D.S.C.); and *Nordby v. 3M Co.*, No. 2:22-cv-01589 (D.S.C.).

There are two sets of insurance policies at issue here. The first is a set of primary policies covering commercial general liability. Fire-Dex purchased these primary policies from Defendant Admiral Insurance Company. The second is a set of umbrella policies that provides coverage once the primary policies' limits are exhausted. Fire-Dex purchased these umbrella policies from Intervenors St. Paul Surplus Lines Insurance Company and Travelers Excess and Surplus Lines Company (collectively, "Travelers"). Fire-Dex contends that these policies cover both the defense of the Underlying Lawsuits and indemnity for any potential liability. Admiral and Travelers disagree.

After the parties spent the past several years litigating the proper forum for their disputes, the merits of their disagreements are now teed up for resolution. Three summary judgment motions are fully briefed and before the Court: one from Fire-Dex (Docs. 51, 58, 61, 66-1),[2] a second from Admiral (Docs. 53, 59, 63), and a third from Travelers (Docs. 54, 60, 67). Also before the Court are twin motions from Fire-Dex to certify a question to the Ohio Supreme Court (Docs. 52, 57, 62, 65) and to exclude Travelers' expert (Docs. 44-46). After carefully considering the relevant policy language, the Court concludes that Admiral does not owe Fire-Dex a duty to defend or indemnify. Accordingly, Fire-Dex's motion for summary judgment is DENIED while Admiral's is GRANTED. The dispute over Travelers' umbrella policies arises from Travelers' counterclaim against Fire-Dex, and the Court finds that Travelers lacks standing to assert its counterclaim. For this reason, the Court cannot reach the merits of that dispute. Travelers' motion for summary judgment is DENIED and its counterclaim is DISMISSED. Lastly, Fire-Dex's motions to certify and exclude are DENIED.

---

[2] For ease and consistency, record citations are to the electronically stamped CM/ECF document and PageID# rather than any internal pagination.

## I. BACKGROUND

Fire-Dex is an Ohio-based company that manufactures personal protective equipment for firefighters—primarily turnout gear but also boots, hoods, gloves, and helmets. (Doc. 1-1 at ¶¶ 1, 7.) In recent years, many firefighters have sued Fire-Dex for injuries purportedly stemming from exposure to PFAS in Fire-Dex products. (*Id.* at ¶¶ 8, 14; Doc. 53-4 at ¶ 35; Doc. 53-5 at ¶ 41; Doc. 53-6 at ¶ 25.) Pertinent here are three such lawsuits, the Underlying Lawsuits, in which firefighters allege that they were "repeatedly exposed to PFAS" when they wore Fire-Dex turnouts "in the usual and normal course of performing their firefighting duties and training." (Doc. 53-4 at ¶ 8; Doc. 53-5 at ¶ 8; Doc. 53-6 at ¶ 8.) This exposure, they say, caused them to develop cancer. (Doc. 53-4 at ¶¶ 14-20; Doc. 53-5 at ¶¶ 14-28; Doc. 53-6 at ¶ 13.)

When Fire-Dex learned of the Underlying Lawsuits, it turned to its insurer, Admiral, for defense and indemnity. (Doc. 1-1 at ¶ 16; Doc. 6 (Answer) at ¶ 16.) Fire-Dex sought coverage under two commercial general liability policies that it had purchased to cover the period from January 1, 2014, to January 1, 2016 (the "Primary Policies"). (Doc. 6 (Answer) at ¶ 11.) The two Primary Policies are substantially similar.[3] They impose a duty on Admiral to defend Fire-Dex from certain lawsuits and to indemnify Fire-Dex from liability arising out of those lawsuits:

> [Admiral] will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. [Admiral] will have the right and duty to defend the insured against any "suit" seeking those damages.

(Doc. 53-2 at 2262.) Since the Policies define "bodily injury" to include "physical sickness" and "physical disease" (*id.* at 2291), like the firefighters' cancers, Fire-Dex believed that the Policies would cover the Underlying Lawsuits.

---

[3] Any differences between the two Policies are immaterial to the disputes analyzed in this Order. As such, the Court cites only to the Primary Policy covering the year beginning January 1, 2014. (Doc. 53-2.)

Admiral had a different perspective. It focused on the Policies' occupational disease exclusion, which reads:

> It is agreed there is no coverage afforded under this policy for any "bodily injury" to **any** individual resulting from any occupational or environmental disease arising out of any insured's operations, completed operations or products.

(*Id.* at 2307 (emphasis in original).) In Admiral's view, the firefighters in the Underlying Lawsuits alleged occupational disease because they alleged that their injuries were caused by PFAS exposure while performing their job duties. (Doc. 63-4 at 2896-97.) Admiral denied coverage based on this exclusion. (*See* Doc. 6 (Answer) at ¶ 17.)

To confirm its position, Admiral filed a declaratory judgment action against Fire-Dex in the Northern District of Ohio, asking the court to declare that it had properly denied coverage. *See Admiral Ins. Co. v. Fire-Dex, LLC* ("*Admiral I*"), No. 1:22-cv-1087, 2022 WL 16552973, 2022 U.S. Dist. LEXIS 198034 (N.D. Ohio Oct. 31, 2022) (Barker, J.). Exercising discretion under the Declaratory Judgment Act, *see AmSouth Bank v. Dale*, 386 F.3d 763, 784 (6th Cir. 2004), the court declined jurisdiction because Admiral's claim raised "novel questions of Ohio insurance law" that were "best reserved for the Ohio state courts to answer in the first instance." *Admiral I*, 2022 WL 16552973, at *10, 2022 U.S. Dist. LEXIS 198034, at *29. The Sixth Circuit affirmed, agreeing that the case "turn[ed] on a novel issue of Ohio insurance law" which the "state courts are best suited to answer." *Admiral Ins. Co. v. Fire-Dex, LLC* ("*Admiral II*"), No. 22-3992, 2023 WL 3963623, at *3, 2023 U.S. App. LEXIS 14822, at *7-8 (6th Cir. June 13, 2023).

Admiral and Fire-Dex then took their dispute to state court. Only this time, Fire-Dex was the one who sued Admiral, asking for a declaration that Admiral owed coverage. (Doc. 1-1 at ¶¶ 32-48.) Fire-Dex also paired its request for declaratory judgment with damages claims for breach of contract and bad faith. (*Id.* at ¶¶ 49-63.) Admiral quickly removed to federal court,

where it filed an answer and counterclaimed for the mirror-image declaration—that it did not owe a defense or indemnity for the Underlying Lawsuits.[4] (Docs. 1, 6.) Fire-Dex responded by moving to remand. (Doc. 8.)

Guided by the Sixth Circuit's admonition in *Admiral II* that it is best for Ohio courts to decide novel issues of Ohio law, this Court remanded the declaratory judgment claim to state court and stayed the damages claims. (Doc. 14.) Admiral appealed, and the Sixth Circuit reversed. *Fire-Dex, LLC v. Admiral Ins. Co.*, 139 F.4th 519 (6th Cir. 2025). As the Circuit explained, the fact that Fire-Dex had asserted damages claims distinguished this case from the earlier declaratory judgment action because the presence of those claims "counsel[s] heavily in favor of not abstaining." *Id.* at 529.

After the case returned to this Court, Travelers entered the fray. Although Fire-Dex had not yet asked Travelers to provide any coverage (Doc. 39 at ¶ 4), Travelers filed a motion to intervene for the purpose of asserting its own declaratory judgment counterclaim against Fire-Dex. (Doc. 34.) Through its counterclaim, Travelers hoped to secure a declaration that it did not owe Fire-Dex a duty to defend or indemnify under two umbrella policies it issued to Fire-Dex (the "Umbrella Policies"). (Doc. 34-1 (Counterclaim) at ¶ 6.) Because no party opposed intervention, the Court granted the motion. (Doc. 38.)

Fire-Dex, Admiral, and Travelers have now each filed motions for summary judgment which together address all claims and counterclaims in this case. (Docs. 51, 53, 54.) Fire-Dex has also filed motions to certify a question to the Ohio Supreme Court (Doc. 52) and to exclude Travelers' expert (Doc. 44).

[4] Admiral technically filed four counterclaims, each disclaiming coverage based on a different exclusion. (Doc. 6 (Counterclaims) at ¶¶ 23-56.) Since they all seek the same declaration, though, the Court treats them as one.

## II. MOTION TO CERTIFY

The Court begins with Fire-Dex's motion to certify. Fire-Dex asks the Court to certify the following question: Whether the Primary Polices' occupational disease exclusion "only applies to claims brought against Fire-Dex by its own employees, or [] also applies to claims brought by non-employees." (Doc. 52 at 2213.)

Under its Rules of Practice, the Ohio Supreme Court may choose to accept certified questions of Ohio law from the federal courts. Ohio S. Ct. Prac. R. 9.01(A). To qualify for certification, a question must satisfy two criteria: (1) it must be "a question of Ohio law that may be determinative of the proceeding," and (2) there must be "no controlling precedent in the decisions of [the Ohio] Supreme Court." *Id.* The decision to certify is within the federal court's discretion. *Pennington v. State Farm Mut. Auto. Ins. Co*, 553 F.3d 447, 449-50 (6th Cir. 2009). Even when all criteria for certification are satisfied, certification is not mandatory. *See Lehman Bros. v. Schein*, 416 U.S. 386, 390-91, 94 S. Ct. 1741, 40 L. Ed. 2d 215 (1974) ("We do not suggest that where there is doubt as to local law and where the certification procedure is available, resort to it is obligatory.").

For questions that meet the criteria for certification, the propriety of certification turns on the balance between two competing federalism concerns. On one side of the ledger, certification of novel state law questions promotes "cooperative judicial federalism" by respecting a state supreme court's "status as the final arbiter on matters of state law." *Planned Parenthood of Cincinnati Region v. Strickland*, 531 F.3d 406, 410 (6th Cir. 2008) (quoting *Arizonans for Official English v. Arizona*, 520 U.S. 43, 77, 117 S. Ct. 1055, 137 L. Ed. 2d 170 (1997)). On the other side is the principle that federal courts should not unnecessarily outsource their work to state courts. Federal courts should "not trouble [their] sister state courts every time an arguably

unsettled question of state law comes across [their] desks." *State Auto Prop. & Cas. Ins. Co. v. Hargis*, 785 F.3d 189, 194 (6th Cir. 2015) (quoting *Pennington*, 553 F.3d at 450). If there is "a reasonably clear and principled course," federal courts should "seek to follow it [them]selves." *Id.* (quoting *Pennington*, 553 F.3d at 450). Or put differently, "[t]he state court need not have addressed the exact question" before a federal court can decide the issue itself, "so long as well-established principles exist to govern a decision." *Id.*

Fire-Dex's proposed question satisfies the criteria for certification. First, "issue[s] of [] insurance contract interpretation are questions of state law," *Bituminous Cas. Corp. v. J & L Lumber Co.*, 373 F.3d 807, 815 (6th Cir. 2004), and interpretation of the occupational disease exclusion has the potential to determine this case. If the exclusion applies to claims raised by non-employees of Fire-Dex, then Admiral prevails because the exclusion applies to the Underlying Lawsuits brought by non-employee firefighters. Second, the Ohio Supreme Court has never interpreted an occupational disease exclusion. The parties do not identify any Ohio Supreme Court decisions construing "occupational disease" in the insurance context. This Court, as well as the *Admiral I* and *Admiral II* courts, has also searched for and failed to find such cases. *See Admiral II*, 2023 WL 3963623, at *3, 2023 U.S. App. LEXIS 14822, at *7; *Admiral I*, 2022 WL 16552973, at *7-8, 2022 U.S. Dist. LEXIS 198034, at *19-20, 22. So as three separate courts have confirmed, occupational disease exclusions present an issue of first impression under Ohio law.

The Court nonetheless finds that certification is not appropriate at this juncture. Even though "the legal question is one of first impression in [Ohio], [] a reasonably clear and principled course of action exists." *Hargis*, 785 F.3d at 194. There is an entire casebook's worth of law defining "occupational disease" that the Court can draw upon for guidance, including both

a statute and several Ohio Supreme Court decisions. *E.g.*, Ohio Rev. Code § 4123.01(F); *State ex rel. Ohio Bell Tel. Co. v. Krise*, 42 Ohio St. 2d 247, 327 N.E.2d 756, 760-61 (1975); *Rambaldo v. Accurate Die Casting*, 65 Ohio St. 3d 281, 603 N.E.2d 975, 979 & n.6 (1992). To be sure, this law arises from the workers' compensation context, and as the *Admiral I* and *Admiral II* courts observed, there is no law interpreting "occupational disease" in an insurance policy. But federal courts may draw upon "analogous" state decisions when deciding issues of first impression in state law. *Hargis*, 785 F.3d at 195.

What is more, the result of this case does not depend solely on the definition of "occupational disease" in a vacuum. The Primary Policies contain other language bearing on the question of whose claims the occupational disease exclusion applies to. Namely, the Primary Policies expressly state that the occupational disease exclusion applies to claims brought by "any individual." (Doc. 53-2 at 2307.) Considering this language, the Court need not make any sweeping pronouncement about occupational disease exclusions under Ohio law; it is enough to issue a party-specific ruling based on the particular language at issue in the Primary Policies. This "any individual" language did not come up before the *Admiral I* and *Admiral II* courts, so it is no surprise that those courts concluded this dispute raised such novel and far-reaching questions of state law that comity counseled in favor of allowing state courts to address those questions in the first instance. *Admiral II*, 2023 WL 3963623, at *3, 2023 U.S. App. LEXIS 14822, at *7-10; *Admiral I*, 2022 WL 16552973, at *7-8, 2022 U.S. Dist. LEXIS 198034, at *19-23; *see also Cardinal Health, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh,* 29 F.4th 792, 799 (6th Cir. 2022) (discussing the need to defer to state courts on novel questions of state law as a matter of comity). But now that this language has been highlighted, the potential impact of the

parties' dispute has narrowed, and any comity concerns about federal courts deciding this dispute of state law are lesser.

Finally, Admiral and Fire-Dex's dispute has lingered far too long without resolution. Including the initial declaratory judgment action filed by Admiral in 2022, it has been four years since litigation over Fire-Dex's insurance coverage began. It is well past time for the parties to receive an answer to their controversy. While certification does not become inappropriate just because a case is old, this case's age is an additional reason for the Court to err in favor of deciding the dispute itself rather than certifying to the Ohio Supreme Court and introducing additional delay. Accordingly, the Court DENIES the motion to certify.

## III. MOTIONS FOR SUMMARY JUDGMENT

### A. Legal Standard

To prevail on summary judgment, a movant must satisfy its burden to "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Williams v. Maurer*, 9 F.4th 416, 430 (6th Cir. 2021). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). And a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In determining whether a genuine dispute of material fact exists, courts must "view all evidence in the light most favorable to the nonmoving party." *Hrdlicka v. Gen. Motors, LLC*, 63 F.4th 555, 566 (6th Cir. 2023) (citation omitted). This standard remains the same even when the parties file cross-motions for summary judgment—the Court must "evaluate each motion on its own merits." *Safety Specialty Ins. Co. v. Genesee Cnty. Bd. of Comm'rs*, 53 F.4th 1014, 1020 (6th Cir. 2022).

### B. Primary Policies

The Court begins with Fire-Dex and Admiral's insurance-coverage dispute over the Primary Policies, proceeding in two parts. First, the Court addresses Fire-Dex's declaratory judgment claim and Admiral's mirror-image counterclaim. Because the occupational disease exclusion applies to the Underlying Lawsuits, the Court concludes that Admiral is not contractually obligated to provide coverage. Second, the Court turns to Fire-Dex's damages claims for breach of contract and bad faith. In light of its above conclusion, the Court finds that the claims for breach of contract and bad faith fail as well.

#### 1. Declaratory Judgment

The Primary Policies' occupational disease exclusion sits at the crux of the parties' coverage dispute. Fire-Dex contends that the exclusion is limited to claims brought by its own employees, so it does not apply to the Underlying Lawsuits, which are brought by non-employee firefighters. Admiral takes the opposite position. It argues that the exclusion also applies to non-employees. Thus, claims Admiral, the exclusion applies to the Underlying Lawsuits and precludes coverage. Admiral has the better argument.

Under Ohio law, insurance policies "are construed by the same rules used to construe contracts." *World Harvest Church v. Grange Mut. Cas. Co.*, 148 Ohio St. 3d 11, 68 N.E.3d 738, 744 (2016). Courts thus seek "to give effect to the intent of the parties to the [policy]." *Westfield Ins. Co. v. Galatis*, 100 Ohio St. 3d 216, 797 N.E.2d 1256, 1261 (2003). That said, courts do not engage in a free-flowing inquiry into the parties' subjective intentions; they instead "examine the insurance contract as a whole and presume that the intent of the parties is reflected in the language used in the policy." *Id.* If the policy is unambiguous, courts are confined to "the writing itself" and may not consider extrinsic evidence. *Id.* In those circumstances, "the plain

and ordinary meaning of the language used in the policy [controls] unless another meaning is clearly apparent from the contents of the policy." *Id.*

Ohio does, however, favor insureds. When a policy provision is ambiguous, it "must be construed strictly against the insurer and liberally in favor of the insured." *Westfield Ins. Co. v. Hunter*, 128 Ohio St. 3d 540, 948 N.E.2d 931, 935 (2011). This principle is especially powerful "when considering provisions that purport to limit or qualify coverage," like exclusions. *Id.* If an exclusion is at issue, courts will interpret that exclusion "as applying only to that which is *clearly* intended to be excluded." *Lager v. Miller-Gonzalez*, 120 Ohio St. 3d 47, 896 N.E.2d 666, 669 (2008) (quoting *Hybud Equip. Corp. v. Sphere Drake Ins. Co.*, 64 Ohio St. 3d 657, 597 N.E.2d 1096, 1102 (1992)). An insurer who invokes an exclusion bears the burden of satisfying this exacting standard. *Motorists Mut. Ins. Co. v. Ironics, Inc.*, 168 Ohio St. 3d 467, 200 N.E.3d 149, 155 (2022). It may do so by showing that its construction of the exclusion "is the only one that can fairly be placed on the language." *Andersen v. Highland House Co.*, 93 Ohio St. 3d 547, 757 N.E.2d 329, 332 (2001) (citation omitted); *see also Grange Indem. Ins. Co. v. Hinds*, 228 N.E.3d 714, 719 (Ohio Ct. App. 2023) (similar).

Applying these rules of construction, the Court concludes that the occupational disease exclusion applies to the Underlying Lawsuits. Recall that the exclusion precludes coverage for lawsuits alleging "'bodily injury' to any individual resulting from any occupational or environmental disease arising out of any insured's . . . products." (Doc. 53-2 at 2307 (emphasis omitted).) There is no dispute that the firefighters in the Underlying Lawsuits suffered a "bodily injury" or that the injury allegedly arose out of Fire-Dex products. Applicability of the occupational disease exclusion thus turns on whether the firefighters are alleging "occupational . . . disease."

The term "occupational disease" is not defined in the Primary Policies, so its plain meaning controls. *Galatis*, 797 N.E.2d at 1261. There is no Ohio Supreme Court decision construing the plain meaning of "occupational disease" in the insurance context, meaning this Court "must predict how the [Ohio Supreme Court] would rule by looking to all the available data." *Hargis*, 785 F.3d at 195 (quoting *Allstate Ins. Co. v. Thrifty Rent-A-Car Sys., Inc.*, 249 F.3d 450, 454 (6th Cir. 2001)). In doing so, the Court looks to the same sources that Ohio courts look to when construing an undefined term in an insurance policy: case law, *Auto-Owners Ins. Co. v. Merillat*, 167 Ohio App. 3d 148, 854 N.E.2d 513, 517 (2006) (citing *Shear v. W. Am. Ins. Co.*, 11 Ohio St. 3d 162, 464 N.E.2d 545, 548 (1984)); Ohio statutes, *Garlick v. McFarland*, 159 Ohio St. 539, 113 N.E.2d 92, 92 (1953) (syllabus);[5] and dictionary definitions, *Textileather Corp. v. GenCorp Inc.*, 697 F.3d 378, 382 (6th Cir. 2012). All three of those sources point in the same direction.[6]

The Ohio Supreme Court's decisions in the workers' compensation context are "analogous cases" that inform the definition of "occupational disease." *Hargis*, 785 F.3d at 195. In that context, the Ohio Supreme Court has consistently defined "occupational disease" as having three criteria: "(1) The disease is contracted in the course of employment; (2) the disease is peculiar to the claimant's employment by its causes and the characteristics of its manifestation or the conditions of the employment result in a hazard which distinguishes the employment in character from employment generally; and (3) the employment creates a risk of contracting the

---

[5] "The Syllabus of an Ohio Supreme Court opinion is binding law." *Wise v. Zwicker & Assocs., P.C.*, 780 F.3d 710, 714 n.2 (6th Cir. 2015) (citing Ohio Rep. Op. R. 2.2.).

[6] Fire-Dex also directs the Court to expert testimony and the deposition of its CEO. (*E.g.*, Doc. 51 at 2120.) Whatever utility those pieces of evidence might have if extrinsic evidence were being considered, they are not sources that Ohio courts rely on when construing the plain meaning of a contractual term. The Court does not consider them.

disease in a greater degree and in a different manner than in the public generally." *Krise*, 327 N.E.2d at 760-61; *see also, e.g.*, *City of Bedford Heights v. France*, 67 Ohio St. 3d 55, 616 N.E.2d 177, 179-80 (1993) (applying the *Krise* definition); *Rambaldo*, 603 N.E.2d at 979 & n.6 (similar); *State ex rel. Republic Steel Corp. v. Indus. Comm'n*, 61 Ohio St. 2d 193, 399 N.E.2d 1268, 1269 (1980) (similar).

That definition has since been codified into Ohio workers' compensation law, which defines "occupational disease" as "a disease contracted in the course of employment, which by its causes and the characteristics of its manifestation or the condition of the employment results in a hazard which distinguishes the employment in character from employment generally, and the employment creates a risk of contracting the disease in greater degree and in a different manner from the public in general." Ohio Rev. Code § 4123.01(F).

And dictionary definitions—both current and as of the time that the Primary Policies were issued—are in accord. For example, Black's Law Dictionary defines "occupational disease" to mean "[a] disease that is contracted as a result of exposure to debilitating conditions or substances in the course of employment." *Occupational Disease*, Black's Law Dictionary (10th ed. 2014). Merriam-Webster refers to "occupational disease" as "an ailment that results from the characteristic conditions or functions of one's employment rather than from the ordinary risks to which the general public is exposed." *Occupational Disease*, Merriam-Webster, https://www.merriam-webster.com/legal/occupational%20disease (last accessed Aug. 27, 2026). And the Oxford English Dictionary reports that "occupational disease" is a "[d]isease caused by or associated with a particular type of work or conditions of work." *Occupational Disease*, Oxford English Dictionary, https://www.oed.com/dictionary/occupational-disease_n (last accessed Aug. 27, 2026).

Given the consistent and common threads running through all of these definitions, the meaning of "occupational disease" in the Primary Policies becomes clear. An illness is an "occupational disease" if it is contracted during and as a result of someone's employment, and the conditions of employment that caused the illness are not ones to which the general public is exposed. Under this definition, the firefighters in the Underlying Lawsuits are suffering from occupational disease. They allegedly contracted their cancers during their employment as firefighters because they were required to wear turnouts containing PFAS. (Doc. 53-4 at ¶¶ 14-20; Doc. 53-5 at ¶¶ 14-28; Doc. 53-6 at ¶ 13.) And members of the public generally do not wear firefighter turnouts.

Up to this point, there does not appear to be much disagreement between Fire-Dex and Admiral. (*See* Doc. 51 at 2118-19; Doc. 53-1 at 2236-39.) Fire-Dex diverges from Admiral in arguing that the occupational disease exclusion applies only to claims brought by Fire-Dex's own employees. Observing that the phrase "occupational disease" almost exclusively comes up in the workers' compensation context, Fire-Dex would limit "occupational diseases" to those which render someone eligible for workers' compensation benefits. (Doc. 51 at 2119-20.) With this additional limit in place, Fire-Dex posits that the occupational disease exclusion can apply only to claims brought by employees against their employers because only employees can recover workers' compensation from their employers. (*Id.* at 2120.)

There are two problems with Fire-Dex's position. The first problem is that Fire-Dex operates from a mistaken premise. Whether or not an illness is an occupational disease does not depend on whether that illness creates eligibility for workers' compensation benefits. Eligibility for workers' compensation does not appear in any part of the Ohio Supreme Court's three-part definition of occupational disease. *See Krise*, 327 N.E.2d at 760-61. Nor does it appear in

Ohio's statutory definition. *See* Ohio Rev. Code § 4123.01(F). Rather, eligibility for workers' compensation is a consequence of satisfying the definition of occupational disease. *Kerr v. OhioHealth Corp.*, 194 N.E.3d 435, 441 (Ohio Ct. App. 2022) (citing Ohio Rev. Code § 4123.54(A)). It makes no sense to incorporate eligibility into the definition of occupational disease if establishing occupational disease is the trigger for eligibility in the first place. Likewise, when dictionary definitions refer to workers' compensation they refer to it as a consequence of occupational disease, not a necessary characteristic of the disease. *See Occupational Disease*, Black's Law Dictionary (10th ed. 2014); *Occupational Disease*, Merriam-Webster, https://www.merriam-webster.com/legal/occupational%20disease (last accessed Aug. 27, 2026).[7]

The second and bigger problem for Fire-Dex is that, even if its premise is correct, its conclusion does not follow. A person's eligibility for workers' compensation does not depend on whom that person seeks compensation from. Imagine a contractor who is eligible for workers' compensation because he developed lung cancer from asbestos exposure on the job. If that contractor sues a third-party instead of his employer—say, a manufacturer of respirators that are alleged to be defective—he remains eligible for workers' compensation. The same is true if that contractor decides to stand pat and not seek compensation from anyone at all. The contractor stays eligible whether he sues his employer, his doctor, an equipment manufacturer, or someone else. Indeed, it would be bizarre to say that an illness is an occupational disease when a plaintiff sues his employer but ceases to be an occupational disease when he sues someone else.

---

[7] The Merriam-Webster definition might be read as saying that eligibility for workers' compensation is a characteristic of occupational disease. But even read that way, Merriam-Webster is just one source arrayed against many others, and it does not change the Court's conclusion.

A Connecticut Supreme Court decision supports this result. *See Hargis*, 785 F.3d at 195 (courts may consult "decisions from other jurisdictions" when predicting how a state supreme court would rule). In *R.T. Vanderbilt Co. v. Hartford Accident & Indemnity Co.*, 333 Conn. 343, 216 A.3d 629, 637-38 (2019), the Connecticut Supreme Court interpreted similar occupational disease exclusions. The insured in that case argued, like Fire-Dex argues here, that the occupational disease exclusions applied only to claims brought by its own employees. *Id.* at 640. The Supreme Court rejected that argument, identifying the same problems just discussed above. The Supreme Court acknowledged "the relationship between occupational disease and workers' compensation" but observed that no definition "suggest[ed] in any way that the phrase 'occupational disease' is a construct devoid of meaning outside the law of workers' compensation." *Id.* at 643. Instead, it explained, mention of workers' compensation in those definitions only "highlight[s] the availability of workers' compensation as a common, legal remedy for claims arising from the underlying condition." *Id.* For that reason, the Connecticut Supreme Court held that an occupational disease exclusion "bar[s] coverage for occupational disease claims brought not only by employees of [the insured] but also by individuals who contracted an occupational disease in the course of their work for other employers." *Id.* at 648 (citation omitted).

In any case, the Court need not rely on the definition of "occupational disease" alone to determine who the occupational disease exclusion covers. The exclusion itself expressly gives the answer: "*any individual*" who suffers from "occupational . . . disease arising out of any insured's . . . products" falls under the exclusion. (Doc. 53-2 at 2307 (emphasis added).) "Any individual" plainly includes both employees and non-employees. And to the extent there were any doubt, a separate section of the Primary Policies excludes from coverage claims brought by

"any employee" under "occupational disease law."[8] (*Id.* at 2296.) "The difference in language demands a difference in meaning." *Gallo v. Moen Inc.*, 813 F.3d 265, 268, 270 (6th Cir. 2016) (applying the "ordinary principles of contract law" to interpret a collective bargaining agreement (citation omitted)). If this separate section is limited to employees by the language "any employee," the occupational disease exclusion must extend beyond employees because it uses the broader term "any individual." [9]

In sum, the occupational disease exclusion unambiguously applies to claims brought by both employees and non-employees of Fire-Dex so long as those claims are based on injuries contracted during and because of some employment, and the conditions of employment causing those injuries are not ones to which the general public are exposed. The Underlying Lawsuits satisfy every aspect of this exclusion. They are brought by plaintiffs who allege injuries (cancers) contracted because of and during their employment (as firefighters), due to conditions that the general public are not exposed to (wearing Fire-Dex turnouts). (*See* Doc. 53-4 at ¶¶ 8,

---

[8] Admiral argues that Fire-Dex's construction of the occupational disease exclusion would make this separate section superfluous, because both the exclusion and this separate section would cover employees. (Doc. 53-1 at 2247-49.) However, Admiral's construction would create the same problem. Under its construction, the exclusion and separate section would both still cover employees; the exclusion would just cover non-employees as well. Arguments about superfluity therefore do not help either party.

[9] Admiral also points to the use of "any Employee" in the occupational disease exclusion contained in Travelers' Umbrella Policies. (Doc. 53-1 at 2246.) The Court is skeptical that it can consider language in other insurance policies issued by other insurers when interpreting the Primary Policies. But the Court need not and does not decide whether it is empowered to do so because Admiral prevails even when disregarding the Umbrella Policies.

14-20, 35; Doc. 53-5 at ¶¶ 8, 14-28, 41; Doc. 53-6 at ¶¶ 8, 13, 25.) Accordingly, Admiral does not owe Fire-Dex any duty to defend or indemnify with respect to those Lawsuits.[10]

### 2. Damages Claims

The Court's ruling on declaratory judgment resolves Fire-Dex's damages claims for breach of contract and bad faith. Fire-Dex's sole theory of breach is that Admiral failed to defend and indemnify as required by the Primary Policies. (Doc. 1-1 at ¶ 52.) Because the Primary Policies do not require Admiral to defend or indemnify, the breach of contract claim fails. Similarly, Fire-Dex's bad faith claim requires it to show that Admiral's "refusal to [provide coverage] is not predicated upon circumstances that furnish reasonable justification therefor." *Zoppo v. Homestead Ins. Co.*, 71 Ohio St. 3d 552, 644 N.E.2d 397, 397 (1994) (syllabus). As Admiral's interpretation of the Primary Policies is correct, its decision not to defend or indemnify is reasonable. Admiral is entitled to summary judgment in its favor on these claims.

Having concluded the occupational disease exclusion precludes coverage, the Court does not address any of the other exclusions that Admiral raises. Each of Fire-Dex's claims fail, and Admiral's counterclaim succeeds. As such, the Court DENIES Fire-Dex's motion for summary judgment and GRANTS Admiral's cross-motion.

## C. Umbrella Policies

With that, the Court turns to the dispute between Fire-Dex and Travelers over the Umbrella Policies. Fire-Dex largely does not engage with the merits of Travelers' counterclaim, which seeks a declaration that the Umbrella Policies do not provide coverage. Instead, Fire-Dex

---

[10] Fire-Dex claims that declaratory judgment related to indemnity on punitive damages is not ripe. (Doc. 51 at 2131.) The Court does not address the arguments related specifically to punitive damages because it concludes that Admiral does not owe any coverage at all.

chooses to attack the counterclaim on jurisdictional grounds. Its jurisdictional challenge is somewhat difficult to follow—at different points Fire-Dex raises mootness, ripeness, and the Court's discretion to decline jurisdiction over declaratory judgment actions (Doc. 51 at 2131; Doc. 60 at 2814-15)—but ultimately the Court agrees with Fire-Dex that "there is no live controversy between Fire-Dex and Travelers related to coverage under the umbrella policies." (Doc. 60 at 2814.) The absence of a live controversy means that Travelers lacks standing to assert its counterclaim.[11]

"Standing is a prerequisite to bringing claims in federal court." *Tapply v. Whirlpool Corp.*, 148 F.4th 407, 414 (6th Cir. 2025). There are three elements to standing, but the relevant one here is injury in fact. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992). To establish injury in fact, a party must demonstrate "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Id.* (internal quotation marks and citations omitted). In the context of declaratory judgment actions, the actual-or-imminent requirement demands the existence of a "controversy . . . of sufficient immediacy and reality." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127, 127 S. Ct. 764, 166 L. Ed. 2d 604 (2007) (quoting *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273, 61 S. Ct. 510, 85 L. Ed. 826 (1941)); *see also Sch. Dist. of City of Pontiac v. Sec'y of U.S. Dep't of Educ.*, 584 F.3d 253, 278 (6th Cir. 2009) (Sutton, J., concurring) ("In a declaratory judgment action, 'injury in fact' turns on whether the threatened harm is real and imminent, as opposed to speculative and distant."). Courts may not adjudicate "disputes that are uncertain to occur or contingent in nature" because such hypothetical disputes

---

[11] Even if Fire-Dex's arguments are not construed to raise standing issues, the Court may still address the issue of standing *sua sponte*. *Bench Billboard Co. v. City of Cincinnati*, 675 F.3d 974, 983 (6th Cir. 2012).

do not injure any party. *Goleta Nat'l Bank v. O'Donnell*, 239 F. Supp. 2d 745, 751 (S.D. Ohio 2002) (quoting 15 *Moore's Federal Practice* § 101.80[1] (Matthew Bender 3d ed.)).

Travelers' status as an intervenor does not alter these requirements. "For all relief sought, there must be a litigant with standing." *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439, 137 S. Ct. 1645, 198 L. Ed. 2d 64 (2017). It follows that an intervenor "must have Article III standing in order to pursue relief that is different from that which is sought by a party with standing." *Id.* at 440. This is true even if intervention is not opposed. *See Rosen v. Tenn. Comm'r of Fin. & Admin.*, 288 F.3d 918, 931 (6th Cir. 2002) (holding that standing cannot be created through the parties' mutual agreement). Since Travelers is the only party seeking relief with respect to the Umbrella Policies, it must have standing.

Standing is assessed at the time of filing, so the Court focuses its analysis on the state of play when Travelers moved to intervene. *Crawford v. U.S. Dep't of Treasury*, 868 F.3d 438, 457 (6th Cir. 2017). At that time, Fire-Dex had given Travelers notice of the Underlying Lawsuits but had not asked Travelers to provide a defense or indemnity. (Doc. 34-1 (Counterclaim) at ¶¶ 4, 19; Doc. 39 at ¶¶ 4, 19.) The only suggestion that there might be some dispute over coverage was Travelers' allegation that *if* the Primary Policies provided coverage for the Underlying Lawsuits, and *if* the limits on those Policies were exhausted, then Fire-Dex was "anticipated" to seek coverage from Travelers. (Doc. 34-1 (Counterclaim) at ¶ 20.) As this chain of events illustrates, the existence of any coverage dispute between Travelers and Fire-Dex was contingent on a series of uncertain future events.

What is more, there is good reason to believe that Fire-Dex will not likely demand coverage from Travelers in the immediate future. Travelers did not move to intervene until March 2026 (Doc. 34), nearly four years after litigation between Fire-Dex and Admiral first

ensued and well after Fire-Dex first learned of the Underlying Lawsuits. *See Admiral Ins. Co. v. Fire Dex, LLC*, No. 1:22-cv-01087 (N.D. Ohio) (filed June 21, 2022). Yet there was no hint during those four years that Fire-Dex intended to expand its insurance dispute to include Travelers. Without any indication that Fire-Dex will be seeking coverage from Travelers in the foreseeable future, any controversy between the two is "wholly conjectural" and "neither real nor immediate." *Golden v. Zwickler*, 394 U.S. 103, 109, 89 S. Ct. 956, 22 L. Ed. 2d 113 (1969). In other words, the dispute that Travelers seeks to have the Court resolve is a "theoretical [one] that may or may not materialize." *Safety Specialty*, 53 F.4th at 1020 (quoting *Saginaw County v. STAT Emergency Med. Servs., Inc.*, 946 F.3d 951, 954 (6th Cir. 2020)). The Court is "prohibit[ed] from passing judgment[]" on such theoretical disputes. *Id.* (internal quotation marks and citation omitted).

Travelers responds that its counterclaim turns on a purely legal question of contract interpretation which does not depend on additional factual developments in the future. (Doc. 67 at 2963.) It also appeals to efficiency, arguing that refusal to consider its counterclaim now would create unnecessary delay and duplicative litigation. (*Id.* at 2964-65.) That may all be true. But the requirements of Article III standing are limits on the Court's power. *Soehnlen v. Fleet Owners Ins. Fund*, 844 F.3d 576, 581 (6th Cir. 2016). No matter how efficient or desirable it might be to have the Court resolve Travelers' counterclaim right now, if Travelers lacks standing, the Court does not have the authority to do so.

For these reasons, the Court DENIES Travelers' motion for summary judgment and DISMISSES Travelers' counterclaim without prejudice. Because the Court dismisses Travelers' counterclaim, it also DENIES as moot the motion to exclude Travelers' expert.

## IV. CONCLUSION

For the reasons stated herein, the Court GRANTS Admiral's motion for summary judgment and DENIES Fire-Dex's cross-motion. The Court DENIES Travelers' motion for summary judgment and DISMISSES its counterclaim for lack of standing. The Court DENIES Fire-Dex's motions to certify a question to the Ohio Supreme Court and to exclude Travelers' expert.

**IT IS SO ORDERED.**

Date: September 3, 2026

BRIDGET MEEHAN BRENNAN
UNITED STATES DISTRICT JUDGE